**Richard P. DZIUBAK, Respondent,**

v.

**J. Thomas MOTT, et al., Appellants.**

**No. C7–91–2517.**

Court of Appeals of Minnesota.

July 14, 1992.

Review Granted Oct. 19, 1992.

Richard W. Johnson, Johnson Law Office, Red Wing, for respondent.

Hubert H. Humphrey, III, Atty. Gen., David T. Schultz, Sp. Asst. Atty. Gen., St. Paul, for appellants.

Considered and decided by KALITOWSKI, P.J., and AMUNDSON and HARTEN, JJ.

## OPINION

KALITOWSKI, Judge.

Appellants J. Thomas Mott and James Hankes challenge the trial court's determination that public defenders are not immune from legal malpractice liability. Respondent Richard Dziubak contends the trial court erred by determining he was collaterally estopped from litigating some of his legal malpractice claims.

### FACTS

May Speiser (the deceased) was found dead in her home on February 25, 1987. The respondent, the deceased's son, found her lying on her bed in her upstairs bedroom. Police officers found a broken handrail and spatters of blood on the stairway leading to the basement.

While performing the autopsy, the medical examiner discovered a note in an undergarment of the deceased. The note, written by the deceased, said "Dick killed me—threw me down basement." The medical examiner classified the death as a homicide concluding a blunt head trauma was the primary cause of death. That conclusion and the injuries on the deceased's body were consistent with a fall down a flight of

stairs. The toxicology report noted the presence of a non-fatal level of anti-depressants in the deceased's blood.

Respondent was subsequently charged with second degree murder and first degree manslaughter. The trial court appointed the public defender's office to represent him and appellants Mott and Hankes were assigned as co-counsel.

The trial was scheduled to begin on April 27, 1987. On April 25, 1987, appellant Mott discussed the medical examiner's report with respondent's medical expert. The expert confirmed the medical examiner's conclusion that the anti-depressants found in the deceased's blood had not contributed to her death.

On April 27, 1987, appellants met with respondent to discuss the merits of his case. The next day, respondent pleaded guilty to a reduced charge of manslaughter. At the plea hearing, respondent admitted he pushed the deceased but denied he intended for her to fall down the stairs. On June 2, 1987, respondent was sentenced to 81 months in Stillwater State Prison.

Sixteen months later, respondent petitioned the Ramsey County District Court to vacate his guilty plea. In his petition for postconviction relief, respondent alleged that his medical expert had misread the toxicology report and that the levels of anti-depressants in the deceased's blood were 100 times greater than the prescribed levels. At the hearing on the petition to vacate the guilty plea, the medical expert testified that he had misread the toxicology report and that the deceased's blood contained lethal levels of anti-depressants. The court granted the petition to vacate the guilty plea. Subsequently, respondent was tried and acquitted of murder.

On June 19, 1991, respondent commenced this action against appellants for legal malpractice claiming, among other things, they were negligent in failing to discover the fatal levels of anti-depressants. Respondent alleges that as a result of the negligence he suffered both physical and psychological distress and defamation.

On September 26, 1991, appellants moved to dismiss respondent's claims asserting they were entitled to immunity from legal malpractice claims and that collateral estoppel prohibits litigation of appellants' alleged negligence in failing to discover the fatal levels of anti-depressants in the deceased's blood. On October 15, the trial court denied the motion to dismiss based on judicial immunity but ruled respondent was collaterally estopped from litigating all claims related to whether appellants were negligent in failing to discover the fatal levels of anti-depressants.

## ISSUES

1. Are public defenders immune from legal malpractice liability under Minnesota law?

2. Does collateral estoppel preclude respondent's legal malpractice claims relating to his attorneys' alleged negligence in failing to discover the fatal levels of anti-depressants?

## ANALYSIS

Whether public defenders are immune from legal malpractice claims is an issue of first impression in Minnesota. Because this is a legal issue, we need not defer to the trial court. *See Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984).

### I.

Appellants argue that judicial immunity should extend to public defenders. The doctrine of judicial immunity was originally designed to protect the autonomy and integrity of the judiciary. *Tindell v. Rogosheske,* 421 N.W.2d 340, 341 (Minn.App.1988) (citing *Gammel v. Ernst & Ernst,* 245 Minn. 249, 254, 72 N.W.2d 364, 368 (1955)), *aff'd* 428 N.W.2d 386 (Minn.1988). In later years, however, it has been extended to protect quasi-judicial officers including prosecutors, court-appointed physicians and therapists, and guardians ad litem. *See, e.g., Sloper v. Dodge,* 426 N.W.2d 478, 479 (Minn.App.1988); *Tindell v. Rogosheske,* 428 N.W.2d 386, 387 (Minn.1988). This extension is justified because "persons who are integral to the judicial process must be able to perform their functions without the

intimidating effect of potential lawsuits." *Tindell*, 421 N.W.2d at 341. Appellants reason that they are similar to judges and prosecutors and require immunity to preserve their independent judgment.

We agree that public defenders serve an integral function in the judicial process. However, we are unpersuaded by appellants' assertion that the rationale which requires immunity for judges and prosecutors applies with equal force to public defenders. Significantly, judges and prosecutors represent the interests of society as a whole rather than serving as an advocate for a particular litigant. *Ferri v. Ackerman*, 444 U.S. 193, 202–03, 100 S.Ct. 402, 408, 62 L.Ed.2d 355 (1979). By simply performing their duties, judges and prosecutors may adversely affect a wide variety of different groups, each of which may be a potential source of controversy. *Id.* 444 U.S. at 203, 100 S.Ct. at 408. Immunity for such officials prevents "an atmosphere of intimidation that would conflict with their resolve to perform their designated functions in a principled fashion." *Id.* 444 U.S. at 204, 100 S.Ct. at 409.

■ Unlike judges or prosecutors, the duty of the public defender is not to the public at large but rather to the individual client. *Spring v. Constantino*, 362 A.2d 871, 874–75 (Conn.1975). Once public defenders are assigned to represent an indigent client their allegiance lies totally with that client. *See id.* The fear of a potential malpractice claim does not conflict with the public defender's obligation to zealously represent his or her client. Rather, as the United States Supreme Court noted, the possibility of a legal malpractice claim may provide an additional incentive for public defenders to serve the undivided interests of their clients. *Ferri*, 444 U.S. at 204, 100 S.Ct. at 409.

■ While we agree that public defenders serve a vital public function by fulfilling the constitutional mandate that indigents receive competent representation, we conclude that judicial immunity is not available to public defenders under current Minnesota law.

■ Appellants also argue that if judicial immunity is not extended, compelling public policy reasons justify recognition of a new immunity for public defenders. Without immunity, they reason, public defenders will be forced to press frivolous claims to protect themselves from malpractice suits thus wasting valuable and scarce resources. They further contend the public defender system will be overburdened and its ability to recruit and retain well-qualified attorneys will suffer.

As the trial court noted, Minnesota has provided a statutory system of public defense for over 50 years. This system has served the public well. The fact that no reported case addresses public defender malpractice or immunity suggests appellants' fears are exaggerated. Moreover, we recognize that appellants, as state employees, have statutory defenses, limited liability, and indemnification protection under Minn.Stat. § 3.736 (1990). While valid policy reasons may justify a grant of immunity for public defenders, we believe this is an issue which is more appropriately addressed by the legislature which can conduct hearings and base its conclusions on empirical data. *See Tower v. Glover*, 467 U.S. 914, 922–23, 104 S.Ct. 2820, 2826, 81 L.Ed.2d 758 (1984).

## II.

■ Collateral estoppel precludes relitigation of issues actually litigated and determined in a prior action and essential to the resulting judgment. *Hauser v. Mealey*, 263 N.W.2d 803, 806 (Minn.1978). Whether collateral estoppel is available involves a mixed question of law and fact and is therefore subject to de novo review. *Regents of Univ. of Minn. v. Medical Inc.*, 382 N.W.2d 201, 207 (Minn.App.1986), *pet. for rev. denied* (Minn. Apr. 18, 1986), *cert. denied* 479 U.S. 910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986). Once the reviewing court determines that collateral estoppel is available, the decision to apply collateral estoppel is left to the trial court's discretion. *Id.* The trial court's decision will be reversed only upon a determination that the court abused its discretion. *Saudi Am. Bank v. Azhari*, 460 N.W.2d 90, 92 (Minn. App.1990).

Collateral estoppel is available where: (1) the issues are identical to those in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party in the previous action; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issues. *Ellis v. Minneapolis Comm'n on Civil Rights,* 319 N.W.2d 702, 704 (Minn.1982) (quoting *Victory Highway Village, Inc. v. Weaver,* 480 F.Supp. 71, 74 (D.Minn.1979)).

Respondent asserts the trial court erred in determining that he was collaterally estopped from litigating whether appellants were negligent in failing to discover the fatal levels of anti-depressants in the deceased's blood. We disagree.

In the criminal case, respondent argued that his medical expert's revised opinion of the toxicology report was newly discovered evidence warranting a withdrawal of his guilty plea. To withdraw his guilty plea because of newly discovered evidence, respondent had to establish the evidence could not have been discovered through the exercise of due diligence. *Saiki v. State,* 375 N.W.2d 547, 549 (Minn.App.1985) (quoting *State v. Caldwell,* 322 N.W.2d 574, 588 (Minn.1982)), *pet. for rev. denied* (Minn. Dec. 19, 1985). At the hearing, respondent strenuously argued that the failure to discover the fatal levels of anti-depressants was not appellants' fault.

In vacating respondent's guilty plea the trial court found:

> [a]t the time of his plea [respondent] was, despite the exercise of due diligence, through no fault of [respondent] or his counsel, unaware of exculpatory evidence that existed.

We conclude that there has already been an adjudication of appellants' due diligence and that respondent was given a full and fair opportunity to be heard on this issue. Therefore, the trial court correctly determined respondent was estopped from litigating appellants' alleged negligence in failing to discover the fatal levels of anti-depressants in the deceased's blood.

## DECISION

Appellants are not immune from legal malpractice liability under Minnesota law.

Collateral estoppel precludes respondent from litigating appellants' alleged negligence in failing to discover the fatal levels of anti-depressants.

Affirmed.